B. Alexandra Jones (Cal. Bar No. 317838)
bajones@duanemorris.com
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105
(415) 957-3000
(415) 957-3001 (facsimile)

Scott H. Angstreich (*pro hac vice* forthcoming)
sangstreich@kellogghansen.com
Alex P. Treiger (*pro hac vice* forthcoming)
atreiger@kellogghansen.com
Brenna L. Darling (*pro hac vice* forthcoming)
bdarling@kellogghansen.com
**KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)

*Attorneys for Plaintiff*
*USTelecom – The Broadband Association*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USTELECOM ASSOCIATION – THE BROADBAND ASSOCIATION,<br><br>          *Plaintiff*,<br><br>     v.<br><br>ALICE BUSCHING REYNOLDS, DARCIE L. HOUCK, JOHN REYNOLDS, KAREN DOUGLAS, and MATTHEW BAKER, in their official capacities as Commissioners of the California Public Utilities Commission,<br><br>          *Defendants*. | Case No. _____<br><br>**COMPLAINT** |

# COMPLAINT

Plaintiff USTelecom – The Broadband Association ("USTelecom") brings this action on behalf of its members for declaratory judgment and injunctive relief against the President and Commissioners of the California Public Utilities Commission ("CPUC"), in their official capacities, stating as follows:

# NATURE OF THE CASE

1. Federal law preempts the recent CPUC Decision[1] extending the agency's rules for traditional, intrastate telephone service to modern, nationwide Voice over Internet Protocol ("VoIP") services. By seeking to fine fixed VoIP providers for not satisfying the CPUC's arbitrary standards, the CPUC has stepped into territory the Communications Act of 1934 reserves for the Federal Communications Commission ("FCC") and that federal courts have long recognized is off-limits to state regulators. The Court should declare that federal law preempts the CPUC from regulating USTelecom members' fixed VoIP services and enjoin the CPUC from enforcing its Order against them.

2. Traditional telephone companies, like USTelecom members and their predecessors, historically offered "plain old telephone service" ("POTS") over copper wires running to consumers' homes. Due to regulatory requirements, those companies had offered consumers separate intrastate (local and toll) and interstate (long-distance) voice services. While states and their state public utility commissions regulated the intrastate services, the FCC regulated the interstate services.

3. In the early 2000s, companies began offering voice services using VoIP technology — relying on the same internet protocol used for sending data over the internet — in competition with POTS providers. But VoIP providers were not saddled with the same bifurcated regulatory regime that had forced POTS providers to offer separate local, intrastate toll, and interstate long-distance services. And VoIP providers never had any business reason to do so or

---

[1] Decision Adopting General Order 133-E, *Order Instituting Rulemaking Proceeding to Consider Amendments to General Order 133*, D.25-09-031, R.22-03-016 (Cal. Pub. Utils. Comm'n Sept. 18, 2025) ("Decision"), https://bit.ly/42W7qdN; *see also id.* App. A ("General Order 133-E" or "Order"), https://bit.ly/4o6LTrk.

to build networks that would support such discrete service offerings. As a result, VoIP providers — which now include USTelecom members — have only ever offered any-distance calling plans that allow customers to make and receive calls nationwide.

4. Over the last 20 years, the FCC has established a uniform national regime for VoIP services. It has repeatedly recognized that, regardless of how VoIP is classified at the federal level, it has the authority to extend the Communications Act's customer-protection requirements to VoIP providers. And in a series of orders, the FCC has done so, establishing what it has described as "measured and appropriate mechanisms for regulating VoIP service" that ensure a "national voice services market," rather than "a patchwork of separate and potentially conflicting requirements on VoIP service." FCC Amicus Br. 2, 18-19, *Charter Advanced Servs., LLC v. Lange*, No. 17-2290 (8th Cir. Oct. 26, 2017) ("FCC *Charter* Amicus Br."), https://bit.ly/4nw9uBv.

5. The FCC has also determined — and federal courts have agreed — that because any-distance VoIP services cannot be practically separated into discrete intrastate and interstate service offerings (in other words, VoIP service is "inseverable"), states are preempted from extending their intrastate POTS regulatory regimes to VoIP providers.

6. Despite this multi-decade history, the CPUC recently adopted a Decision to amend its General Order 133. The new General Order 133-E extends the CPUC's intrastate POTS service-quality rules — backed by potentially massive fines — to certain VoIP providers (including USTelecom members).

7. The CPUC, however, is not extending those intrastate POTS rules to *all* VoIP providers — it concedes that federal law preempts it from regulating so-called "nomadic" VoIP providers (like Vonage or Ooma), whose customers can use the VoIP service anywhere they have a high-speed internet connection.

8. But the CPUC contends that federal law does not preempt it from regulating USTelecom members' so-called "fixed" VoIP services, which those members provide over lines deployed to customers' residences. The CPUC contends that, because fixed VoIP providers know their customers' service addresses, their VoIP services are severable for jurisdictional purposes,

and the CPUC can regulate the intrastate components of their any-distance service offerings.

9. The CPUC is wrong. Under federal law, fixed VoIP is inseverable, just like nomadic VoIP. Like nomadic VoIP providers, fixed VoIP providers have only ever offered any-distance service — they have no reason to create separate local, intrastate toll, and interstate long-distance calling plans or customer service operations. And in any case, fixed VoIP providers typically *cannot* distinguish in real-time between intrastate and interstate calls because, as the FCC has recognized, they have no reliable way during a call to locate the other party to it. Because *all* VoIP services are inseverable, the CPUC is preempted from regulating all such services, just as the CPUC recognizes is true of nomadic VoIP providers.

10. The CPUC has overstepped its authority by extending its intrastate POTS service-quality standards to fixed VoIP providers. The Court should declare that the CPUC's General Order 133-E is preempted insofar as it applies to USTelecom members' fixed VoIP services and enjoin the CPUC's Commissioners from enforcing it against them.

## PARTIES

11. Plaintiff USTelecom is a non-profit association representing service providers and suppliers for the telecom industry. Its members include AT&T and Frontier, national communications companies that provide fixed VoIP service to residential and small business customers in California and nationwide.

12. USTelecom has standing to bring the claims asserted in this Complaint on behalf of its members because (a) the subject matter of this suit is germane to USTelecom's purpose to advocate on behalf of its members for policies that will enhance the economy and facilitate a robust telecommunications industry; (b) USTelecom members would have standing on their own to bring these claims, given the substantial harms that members face if the invalid state order at issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires the participation of USTelecom's individual members in this lawsuit.

13. Defendant Alice Busching Reynolds is a Commissioner and the President of the CPUC. President Reynolds is sued in her official capacity only, and for declaratory and injunctive relief only.

14. Defendant Darcie L. Houck is a Commissioner on the CPUC. Commissioner Houck is sued in her official capacity only, and for declaratory and injunctive relief only.

15. Defendant John Reynolds is a Commissioner on the CPUC. Commissioner Reynolds is sued in his official capacity only, and for declaratory and injunctive relief only.

16. Defendant Karen Douglas is a Commissioner on the CPUC. Commissioner Douglas is sued in her official capacity only, and for declaratory and injunctive relief only.

17. Defendant Matthew Baker is a Commissioner on the CPUC. Commissioner Baker is sued in his official capacity only, and for declaratory and injunctive relief only.

18. Defendants have been, are presently, and will be acting under color of authority and law of California. Defendants are responsible for issuing and enforcing the CPUC Order that federal law preempts.

**JURISDICTION AND VENUE**

19. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because USTelecom's claims arise under the laws of the United States, including the Communications Act, 42 U.S.C. § 1983, and the Supremacy Clause of the United States Constitution. This Court has equitable jurisdiction to enjoin actions by state officials that are preempted by federal law. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015) (citing *Ex parte Young*, 209 U.S. 123, 150-51 (1908)); *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (same).

20. Because an actual controversy within the Court's jurisdiction exists, this Court may grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because the CPUC's principal office is located at 505 Van Ness Avenue, San Francisco, California, and all Defendants reside in California. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because USTelecom members provide services in this District that will be injured by the Order.

22. Divisional Assignment: Pursuant to Local Rule 3-2, assignment to the San Francisco or Oakland Division is proper because the CPUC's principal office is located in San

Francisco County and a substantial part of the events that gave rise to the claims occurred in San Francisco County.

## STATEMENT OF FACTS

***USTelecom Members Offer Nationwide, Any-Distance Fixed VoIP Services***

23. USTelecom members offer a variety of communications services, including video, voice, and broadband internet access. One of those services is VoIP.

24. VoIP is a voice communication service that allows users to make and receive calls using the same internet protocol that is used to send streaming video, emails, and webpages over the internet.

25. VoIP differs from POTS service, which transmits telephone calls using electrical signals over dedicated physical circuits, historically using copper wires. A dedicated circuit is established between the calling party and the called party for the duration of each telephone call.

26. By contrast, VoIP service breaks up voice calls into small data packets, which can be sent over different routes between the calling party and the called party. Once the packets reach their destination, they are reassembled into the original voice message. This is a more robust and more efficient method of transmitting calls than using dedicated circuits.

27. Federal law divides VoIP services into two categories: "interconnected" and "non-interconnected." An interconnected VoIP service allows the user to make and receive calls to and from traditional telephone numbers, including those assigned to non-VoIP users. 47 U.S.C. § 153(25); 47 C.F.R. § 9.3. In contrast, a non-interconnected VoIP service normally allows users to communicate only with others using the same VoIP application, such as Apple's FaceTime Audio or WhatsApp. 47 U.S.C. § 153(36). Because this case only involves interconnected VoIP services, the Complaint uses VoIP to refer only to interconnected VoIP.[2]

28. VoIP providers also differ based on whether they sell their customers not only the voice service, but also the physical broadband connection to their premises. Fixed VoIP

---

[2] This case also involves only "wireline" VoIP — that is, VoIP service transmitted over a wired connection between the customer and the telephone company — and not VoIP service provided over wireless networks. *See* Decision at 1, 104, 206 (declining to extend the intrastate POTS service-quality rules to wireless voice services). Thus, VoIP as used in this Complaint refers only to wireline, interconnected VoIP services.

providers — like USTelecom members AT&T and Frontier — sell VoIP customers both the VoIP telephone service and a broadband connection that runs between the customer's home and the provider's network. Fixed VoIP providers may also offer their customers the ability to make and answer telephone calls, using their home telephone number, over the internet, from any location where the customer has internet access.

29. In contrast, nomadic VoIP providers like Vonage and Ooma only sell customers the VoIP service. To use that service, the nomadic VoIP customer must also use a separately obtained broadband connection. As a result, nomadic VoIP customers can use their VoIP service from anywhere they have high-speed internet access, whether at home or while traveling.

30. VoIP services also emerged in a different regulatory and competitive environment from traditional POTS service. Traditional telephone service in the United States began as a monopoly service, largely held by Bell Systems. The Communications Act of 1934 enshrined this monopoly into law and divided telephone service into two components: intrastate service (local and intrastate toll), which was subject to state regulation, and interstate service, over which the FCC had authority. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986). In 1984, an antitrust settlement broke up the Bell system, requiring the divestiture of the local Bell telephone companies. *See United States v. AT&T Co.*, 552 F. Supp. 131, 163 (D.D.C. 1982), *aff'd*, 460 U.S. 1001 (1983). Under the settlement, these local telephone companies provided service within their exclusive local areas but were prohibited from selling interstate long-distance service — and even some intrastate toll services. As a result, customers buying POTS service could have three separate telephone carriers: one for local calls, another for intrastate toll calls, and a third for interstate long-distance calls.

31. VoIP providers were never subject to this historical regulatory system. On the contrary, VoIP providers have always competed with other VoIP providers, POTS providers, and wireless providers. They were also never required by law to offer separate local, intrastate toll, and interstate long-distance calling services. And they had no business reason to offer those separate services. Therefore, VoIP providers generally — and USTelecom members specifically — never did. Nor did they build their VoIP networks to support separable local, intrastate toll,

and interstate long-distance service offerings.  Instead, they have only ever sold any-distance VoIP services, allowing customers to make and receive calls nationwide for a single price.

32. Today, all voice communication services, including VoIP providers, vigorously compete for customers.  Fixed VoIP providers compete with other fixed VoIP providers (including legacy phone and cable companies that offer VoIP services), nomadic VoIP providers, fixed and mobile wireless providers, and providers of satellite phone services.

33. Of these options, mobile wireless services currently dominate.  In 2024, more than 78 percent of adults and more than 86 percent of children in the United States (roughly 268 million people in total) lived in a household that had only wireless phone service.[3]  Mobile adoption among California residents closely tracks the national trend.[4]

34. VoIP providers also must work hard to keep their customers.  Switching providers is easy.  Customers can switch providers and service type while keeping their telephone numbers. VoIP providers therefore have strong marketplace incentives to provide excellent customer service, lest they lose their customers to a competitor.

***Exercising Its Jurisdiction Over Interstate Communications, the FCC Has Adopted Carefully Calibrated Regulation of VoIP Services***

35. In the early 2000s, as consumers started to purchase VoIP services, some states tried to extend their intrastate POTS regulations to these newer voice offerings.  But in its 2004 *Vonage Order*,[5] the FCC held that federal law preempted the Minnesota Public Utilities Commission from applying its traditional telephone regulations to Vonage's nomadic VoIP service.  The FCC found that, because Vonage had no practical way to separate its any-distance VoIP offering into intrastate and interstate components, Minnesota's nominally intrastate

---

[3] *See* Nat'l Ctr. for Health Stats., *Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July-December 2024*, at 2 (June 2025), https://bit.ly/4o5PF48.

[4] *See* Nat'l Ctr. for Health Stats., Modeled estimates (with standard errors) of the percent distribution of personal telephone status by state (2023), at 1, 3, tbls. 1 & 2, https://bit.ly/46xBpew (showing that 76.6 percent of adults and 86.6 of children residing in California use only wireless telephone service, respectively).

[5] Memorandum Opinion and Order, *Vonage Holdings Corp.*, 19 FCC Rcd 22404 (2004) ("*Vonage Order*"), *aff'd*, *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570 (8th Cir. 2007).

regulation would also regulate Vonage's interstate services in a manner that conflicted with the FCC's rules governing those services. *See Vonage Order* ¶ 14. The FCC explained further that all other VoIP services — including fixed VoIP services — are likely inseverable as well. *See id.* ¶¶ 1, 32 & n.113. The Eighth Circuit upheld the *Vonage Order*. *See Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 578 (8th Cir. 2007).

36. Since issuing the *Vonage Order*, the FCC has adopted a series of orders in which it has established a uniform regulatory regime for VoIP services. In some cases, the FCC has determined that regulations applicable to POTS providers should also apply to VoIP providers — including federal and state universal service contribution requirements,[6] 9-1-1 service,[7] customer privacy,[8] and discontinuance obligations.[9]

37. For example, the FCC has extended its POTS outage-reporting requirements to VoIP providers.[10] The FCC determined that those outage-reporting requirements were the "most effective and least burdensome way" to facilitate reliable 9-1-1 service by VoIP providers.[11] Thus, the agency chose to employ a "light-touch approach of using outage reporting requirements to facilitate the development and use of voluntary best practices, rather than an approach that relies on such measures as mandating specified levels of performance."[12]

38. In other cases, the FCC has declined to extend its POTS regulations to VoIP

---

[6] Report and Order and Notice of Proposed Rulemaking, *Universal Service Contribution Methodology*, 21 FCC Rcd 7518, ¶¶ 34-62 (2006), *pet. for review denied in relevant part*, *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1235-41 (D.C. Cir. 2007); Declaratory Ruling, *Universal Service Contribution Methodology*, 25 FCC Rcd 15651 (2010) ("*State VoIP USF Order*").

[7] First Report and Order and Notice of Proposed Rulemaking, *IP-Enabled Services*, 20 FCC Rcd 10245 (2005) ("*VoIP 911 Order*"), *pet. for review denied*, *Nuvio Corp. v. FCC*, 473 F.3d 302 (D.C. Cir. 2006).

[8] Report and Order and Further Notice of Proposed Rulemaking, *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, 22 FCC Rcd 6927, ¶¶ 54-59 (2007), *pet. for review denied*, *NCTA v. FCC*, 555 F.3d 996 (D.C. Cir. 2009).

[9] Report and Order, *IP-Enabled Services*, 24 FCC Rcd 6039 (2009).

[10] Report and Order, *Proposed Extension of Part 4 of the Commission's Rules Regarding Outage Reporting to Interconnected Voice Over Internet Protocol Service Providers and Broadband Internet Service Providers*, 27 FCC Rcd 2650, ¶ 23 (2012) ("*VoIP Outage Order*").

[11] *Id.* ¶ 22.

[12] *Id.* ¶ 23.

1   providers. For example, when the FCC adopted rules to prevent "cramming" — the inclusion of
2   unauthorized charges on phone bills — the FCC did not extend those rules to VoIP providers,
3   finding no evidence of a cramming problem on VoIP bills.[13] But the FCC noted that it would
4   "continue to monitor . . . to determine whether and when additional Commission action may be
5   appropriate."[14]

6   39. The FCC has stated that it has authority to make these decisions about whether and
7   how to regulate VoIP service, regardless of whether VoIP is properly classified under the
8   Communications Act as a common-carrier telecommunications service or an information service.
9   The FCC has explained that, if VoIP (like POTS) is a common-carrier telecommunications
10  service, the FCC can regulate VoIP under Title II of the Communications Act. But if VoIP is,
11  instead, an information service, the FCC can regulate VoIP using its well-recognized Title I
12  ancillary authority because VoIP is a substitute for traditional telephone service. *See*, *e.g.*, *VoIP*
13  *911 Order* ¶ 26; *see also ACA Connects v. Bonta*, 24 F.4th 1233, 1238 (9th Cir. 2022) (describing
14  the difference between Title I and Title II of the Communications Act).

15  40. As the FCC has explained, through its many orders regarding VoIP service, it has
16  adopted "measured and appropriate mechanisms for regulating VoIP service" that ensure a
17  "national voice services market." FCC *Charter* Amicus Br. 2. In contrast, allowing the various
18  states to "subject[] fixed VoIP service to an extensive array of state public-utility requirements"
19  would conflict with the FCC's approach and create "a patchwork of separate and potentially
20  conflicting requirements on VoIP service" that could "stifle competition and innovation" and
21  "deprive consumers of access to valuable new services." *Id.* at 18-19. Accordingly, if a state
22  public utility commission has concerns about VoIP services, it should "raise[] those concerns
23  with the FCC by requesting a declaratory ruling or a new rulemaking," so the FCC can decide

---

[13] Report and Order and Further Notice of Proposed Rulemaking, *Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming")*, 27 FCC Rcd 4436, ¶ 47 (2012).

[14] *Id.*; *see also VoIP 911 Order* ¶ 44 (declining to adopt performance standards for registered location updates); Report and Order, *Numbering Policies for Modern Communications*, 30 FCC Rcd 6839, ¶¶ 42-50 (2015) (declining to adopt certain requirements as preconditions for VoIP providers to obtain telephone numbers).

whether to "offer a solution that would apply nationwide." *Id.* at 25-26.  In other words, when it comes to regulating VoIP services, states lack the authority to jump ahead of the FCC.  *See Vonage Holdings Corp. v. Neb. Pub. Serv. Comm'n*, 564 F.3d 900, 905 (8th Cir. 2009) (finding state universal service fund obligations preempted as applied to VoIP services because the "FCC has made clear it, and not state commissions, has the responsibility to decide if . . . regulations will be applied" to VoIP); *see also State VoIP USF Order* ¶ 11 (authorizing states to begin requiring VoIP providers to contribute to state universal service fund regimes).

***The CPUC's Recent Order Extends Intrastate POTS Rules to Fixed VoIP Services***

41. In March 2022, the CPUC initiated rulemaking proceedings to extend its POTS service-quality requirements to fixed VoIP service providers.[15]

42. Over the next three years, the CPUC received comments from providers of an array of communication services, trade associations, and consumer-advocacy groups.  None of those comments demonstrated deficiencies in the service quality that fixed VoIP providers offer their customers or showed that market forces do not provide sufficient incentive for fixed VoIP providers to offer high-quality, reliable service.

43. Nonetheless, on September 18, 2025, the CPUC adopted a Decision that amends General Order 133.  The amended Order, General Order 133-E, extends California's POTS service-quality requirements to fixed VoIP providers "for the first time"[16] and imposes potentially massive fines on providers that do not meet those requirements.  *See* General Order 133-E §§ 2.1(f), 2.2(f), 2.3(f).  The new penalty rules take effect on January 1, 2027.  Decision at 207.

44. For example, fixed VoIP providers face fines of $5 per customer per day if they fail to meet a 100 percent standard of establishing service within five business days of when a residential or small business customer places an installation order.  General Order 133-E § 2.1(a), (f).  Similarly, fixed VoIP providers face fines of $5 per line per day for any line affected by an outage that the provider does not repair within 24 hours after the outage is reported.  *Id.* § 2.2(a),

---

[15] Order Instituting Rulemaking Proceeding to Consider Amendments to General Order 133, R.22-03-016 (Cal. Pub. Utils. Comm'n Mar. 17, 2022), https://bit.ly/4n6Quc9.

[16] News Release, Cal. Pub. Utils. Comm'n, *CPUC Sets Stronger Service Quality Standards for Voice Providers Across California* (Sept. 23, 2025), https://bit.ly/4pYd1KM.

(f).  And fixed VoIP providers face fines of $5 per line multiplied by ten percent for each day they fail to maintain a local, toll-free customer service access line accessible 24 hours a day, seven days a week manned by "trained company representatives" who "answer 80% of the customer service calls within 60 seconds."  *Id.* § 2.3(a)(i)-(ii), (f).  The CPUC's customer service rules also require providers to return all customer calls with a customer representative instead of allowing use of AI-technology services, such as chatbots, to more quickly respond to customer messages.  *See id.* § 2.3(a)(i)-(ii); Decision at 155.

45. In addition, the Order imposes reporting requirements on fixed VoIP providers. General Order 133-E § 3.  These include submitting annual reports listing all violations and fines. *Id.* § 3.3.  Fixed VoIP providers that "fail to repair 90% of the access line outages within 24 hours" over a six-month period must also submit a "corrective action plan" outlining the steps to achieve compliance with that standard.  *Id.* § 4.  This "corrective action plan" is to "include timelines, assign responsible staff or departments, detail the investment amount to execute the plan, establish performance metrics, and outline progress monitoring mechanisms."  *Id.*

46. The Order expressly exempts nomadic-only VoIP providers.  *Id.* §§ 2.1, 2.2, 2.3; *see id.* § 1.3(p).  That is because the CPUC has recognized that its "authority to regulate . . . nomadic interconnected VoIP service has been limited by" the *Vonage Order*, which "preempts [states] from adopting regulations that act as conditions to market entry for nomadic-only interconnected VoIP services similar to Vonage's DigitalVoice."[17]  But the CPUC has asserted that federal law does not similarly preempt it from regulating fixed VoIP providers, because fixed VoIP services are "tethered to the subscriber's location, which would therefore subject any intrastate calls to state regulation."[18]

47. The CPUC also interprets the *Vonage Order* to preclude it from regulating

---

[17] Decision Establishing Regulatory Framework for Telephone Corporations Providing Interconnected Voice Over Internet Protocol Service and Launching Second Phase of Proceedings, *Order Instituting Rulemaking Proceeding to Consider Changes to Licensing Status and Obligations of Interconnected Voice Over Internet Protocol Carriers*, R.22-08-008, at 20, 24 (Cal. Pub. Utils. Comm'n Nov. 7, 2024), https://bit.ly/48LdERu.

[18] *Id.* at 25-26.

"nomadic-only" VoIP providers.[19] Thus, the Order applies to nomadic features included as part of fixed VoIP services. *See* General Order 133-E § 2.3. Those features allow customers to make and receive telephone calls from their fixed VoIP number over the internet via an app installed on their smartphone. Accordingly, these fixed VoIP services are also subject to the Order's requirements and penalties, even though customers may use these services to make and receive telephone calls while outside California.

**Federal Law Preempts the CPUC from Applying Its POTS Service-Quality Rules to Fixed VoIP Providers**

48. Under the Supremacy Clause of the United States Constitution, a state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

49. Although the Communications Act generally preserves state authority to regulate intrastate communications services, *see* 47 U.S.C. § 152(b), courts recognize that when such state regulation would negate or conflict with federal exercise of authority over interstate communications, the state regulation must yield. *See, e.g.*, *La. Pub. Serv. Comm'n*, 476 U.S. at 368; *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578; *N.Y. State Comm'n on Cable Television v. FCC*, 749 F.2d 804 (D.C. Cir. 1984).

50. Under the well-recognized "impossibility exception" to state authority over intrastate communications services, the FCC may "preempt state regulation of a service" if, in the context of that regulation, "(1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory policies." *Minn. Pub. Utils. Comm'n*, 483 F.3d at 578 (discussing 47 U.S.C. § 152(b) (preserving state jurisdiction over intrastate communications services)).

51. Because it is not possible to separate the intrastate and interstate aspects of any-distance fixed VoIP services in the context of the CPUC's Order and because the CPUC's Order conflicts with federal regulatory policies governing fixed VoIP, federal law preempts the Order as

---

[19] *Id.* at 24.

applied to fixed VoIP services.

***USTelecom Members' Fixed VoIP Services Are Inseverable***

52. The first requirement for the impossibility exception is met because it is not possible to separate the interstate and intrastate aspects of USTelecom members' fixed VoIP services that the CPUC's Order regulates.

53. First, unlike POTS providers, fixed VoIP providers like USTelecom members only ever offered any-distance services. Those VoIP providers do not have — and have never had — any business or regulatory reason to design their operations to distinguish between intrastate and interstate services. Even assuming that fixed VoIP providers could isolate the intrastate aspects of their services, doing so would require them to fundamentally alter their operations (and potentially, their offerings) in a way that makes no business sense.

54. Second, in most circumstances, fixed VoIP providers cannot determine on a real-time basis whether a particular call is intrastate or interstate. Although fixed VoIP providers may be able to determine the geographic location of their customers,[20] those providers have no reliable method for knowing the location of the person at the other end of the call while the call is occurring, except where both parties to the call subscribe to the same fixed VoIP provider (and both customers are at their service address).

55. As the FCC has recognized, the way in which providers had historically jurisdictionalized calls — NPA-NXX codes (i.e., the first six numbers of a 10-digit telephone number) — has become unreliable for real-time call analysis.[21] In 2021, the FCC explained that, due to a variety of technological, regulatory, and marketplace developments, "it is simply not reasonable or reliable now, nor has it been for many years, to assume that a called party is physically located in the geographic area (rate center) of the switch to which the party's NPA-NXX code is native" for purposes of determining whether interstate rate caps apply to individual

---

[20] Fixed VoIP services may also include a nomadic component, which customers can use from any geographic location where they have access to a high-speed internet connection.

[21] Third Report and Order, Order on Reconsideration, and Fifth Further Notice of Proposed Rulemaking, *Rates for Interstate Inmate Calling Services*, 36 FCC Rcd 9519, ¶ 246 (2021).

calls.[22]

56. Third, even if fixed VoIP providers could reliably distinguish in real time between intrastate and interstate *calls*, the CPUC's Order regulates fixed VoIP providers' *customer service* operations — and those aspects of the providers' service offerings cannot be split up into separate operations for intrastate and interstate calls. USTelecom members have unified teams that address fixed VoIP customer needs for installation, repair, and customer support, without regard to whether a customer's request involves an intrastate or interstate call. Those providers do not maintain a customer service call line specific to intrastate calling, and there is no business reason for them to do so, since they do not offer intrastate-only services — they offer only any-distance services. Thus, there is no way for fixed VoIP providers to comply with the CPUC rules only for intrastate VoIP service.

***General Order 133-E Conflicts with Federal Regulation of VoIP Service***

57. The second requirement for the impossibility exception is satisfied because, by extending traditional POTS regulation to VoIP providers offering a jurisdictionally inseverable service, the Order conflicts with the FCC's rules and orders creating a single, national regime for VoIP services.

58. In the *Vonage Order*, the FCC held that national — not state-by-state — regulation of VoIP services is appropriate, explaining that "the provision of tightly integrated communications capabilities greatly complicates the isolation of intrastate communication and counsels against patchwork regulation," *Vonage Order* ¶ 32, and that "all-distance service[s]" like VoIP "need[] *uniform national* treatment on many issues," *id.* ¶ 22 (emphasis added).

59. The FCC was particularly concerned that allowing state regulations to stand "would invite similar imposition of 50 or more additional sets of different economic regulations . . . , which could severely inhibit the development" of VoIP services. *Id.* ¶ 37.

60. After the *Vonage Order*, the FCC has issued a series of orders in which it has carefully calibrated its regulation of VoIP and has extended some — but not all — regulations applicable to POTS providers to VoIP providers.

---

[22] *Id.*; *see id.* ¶¶ 247, 254 & nn.801, 803.

61. Surveying those decisions, the FCC explained that they form a "measured and appropriate mechanism[] for regulating VoIP service" that ensures a "national voice services market." FCC *Charter* Amicus Br. 2. If a state public utility commission has concerns about VoIP services, it should "raise[] those concerns with the FCC by requesting a declaratory ruling or a new rulemaking," so the FCC can decide whether to "offer a solution that would apply nationwide." *Id.* at 25-26. In contrast, "subjecting fixed VoIP service to an extensive array of state public-utility requirements" would create "a patchwork of separate and potentially conflicting requirements on VoIP service." *Id.* at 18-19.

62. The CPUC's Order thus conflicts with the FCC's procompetitive, light-touch, national regime for VoIP services.

63. It imposes on VoIP providers extensive, state-specific requirements that the FCC has declined to impose. For example, the Order imposes specific performance requirements for repairing outages, as well as significant penalties for failing to meet them. In contrast, the FCC has employed a "light-touch approach of using outage reporting requirements to facilitate the development and use of voluntary best practices, rather than . . . mandating specified levels of performance."[23]

64. The Order therefore stands as an obstacle to effectuating the FCC's regulatory objectives and is preempted as applied to fixed VoIP service. *See*, *e.g.*, *Cap. Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 708 (1984) (state law preempted where it created "a result [that] is wholly at odds with the regulatory goals contemplated by the FCC").

**CLAIMS FOR RELIEF**

**COUNT I**

***Declaratory Judgment That Federal Law Preempts the Order***

65. The allegations of paragraphs 1 through 64 are incorporated herein.

66. The Order is preempted because it conflicts with FCC orders and the Communications Act. Under the Supremacy Clause of the United States Constitution, U.S.

---
[23] *VoIP Outage Order* ¶ 23.

Const. art. VI, cl. 2, state laws that contravene validly enacted federal laws or federal agency orders are preempted and have no force or effect.

67. There is an actual controversy within the jurisdiction of this Court about the legality of the Order.

## COUNT II

### *Declaratory Judgment That Enforcement of the Order Would Violate 42 U.S.C. § 1983*

68. The allegations of paragraphs 1 through 64 are incorporated herein.

69. For the reasons noted above, the Order is preempted by federal law, and its enforcement against USTelecom members would violate the Supremacy Clause of the United States Constitution.

70. The CPUC's enforcement of the Order will therefore deprive USTelecom members of their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

71. There is an actual controversy within the jurisdiction of this Court about whether enforcement of the Order would violate 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, USTelecom requests the following relief:

1. A declaration and judgment pursuant to 28 U.S.C. § 2201 that the Order is preempted by federal law.
2. A declaration and judgment pursuant to 28 U.S.C. § 2201 that enforcement of the Order will deprive USTelecom members of their rights under the Constitution, in violation of 42 U.S.C. § 1983.
3. Preliminary and permanent injunctive relief preventing Defendants from enforcing or giving effect to the Order.
4. An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.
5. Such further relief as the Court deems just and equitable.

DATED: October 17, 2025        DUANE MORRIS LLP

/s/ *B. Alexandra Jones*
B. Alexandra Jones (Cal. Bar No. 317838)
bajones@duanemorris.com
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105
(415) 957-3000
(415) 957-3001 (facsimile)

Scott H. Angstreich (*pro hac vice* forthcoming)
sangstreich@kellogghansen.com
Alex P. Treiger (*pro hac vice* forthcoming)
atreiger@kellogghansen.com
Brenna L. Darling (*pro hac vice* forthcoming)
bdarling@kellogghansen.com
**KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (facsimile)

*Attorneys for Plaintiff*
USTelecom – The Broadband Association