United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| USTELECOM – THE BROADBAND ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>ALICE BUSCHING REYNOLDS, et al.,<br><br>Defendants. | Case No. 25-cv-08959-LB<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 23 |

**INTRODUCTION**

Plaintiff USTelecom – The Broadband Association challenges a decision of the California Public Utilities Commission (CPUC) extending certain service-quality rules (installation timelines, outage restoration, repair intervals, and customer-service responsiveness) — historically applicable to landlines — to fixed interconnected Voice over Internet Protocol (VoIP) providers. VoIP allows calls over the internet. Fixed interconnected VoIP allows internet calls (including calls to and received from traditional landlines) via a broadband connection to a customer's physical address. The decision exempts nomadic VoIP service, which allows internet calls wherever the user is. The CPUC's service-quality standards are enforced through reporting requirements and potential fines.

USTelecom, on behalf of its members (including AT&T and Frontier), asserts that the Communications Act of 1934 and Federal Communications Commission (FCC) policy preempt California's action under the "impossibility exception" to state regulation of intrastate services

ORDER – No. 25-cv-08959-LB

because VoIP cannot be separated into intrastate and interstate components for compliance. The defendants — CPUC commissioners sued in their official capacity under *Ex parte Young* for declaratory and injunctive relief — moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the complaint does not plausibly allege preemption. The motion is granted.

The Communications Act preserves state authority over intrastate communications. 47 U.S.C. § 152(b); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986). While courts recognize a limited "impossibility exception" permitting federal preemption where interstate and intrastate aspects of a service cannot be separated and state regulation would interfere with federal objectives, that doctrine is narrow. *Pub. Serv. Comm'n of Md. v. FCC*, 909 F.2d 1510, 1515 (D.C. Cir. 1990); *California v. FCC*, 905 F.2d 1217, 1243 (9th Cir. 1990). Even accepting USTelecom's allegations of inseverability at the pleadings stage, the complaint does not identify a federal objective that conflicts with California's service-quality rules. To the contrary, the FCC has recognized a role for states in consumer-protection regulation, including with respect to VoIP. Because USTelecom has not plausibly alleged conflict preemption, the complaint fails to state a claim.

## REGULATORY SCHEME

### 1.  The Regulated Telecommunications

The technology at issue involves VoIP service. Traditional telephone calls ("plain old telephone service" or POTS) are transmitted over dedicated physical circuits, historically over copper wires. VoIP service breaks voice calls into data packets, sends them via different internet routes, and reassembles them at the destination. VoIP services are either interconnected or non-interconnected. An interconnected VoIP service allows the user to call or receive calls from traditional telephone numbers, even if associated with non-VoIP users. 47 U.S.C. § 153(25); 47 C.F.R. § 9.3. A non-interconnected VoIP service typically allows users to communicate only with others using the same app, such as FaceTime or WhatsApp. 47 U.S.C. § 153(36). USTelecom's members are "fixed" interconnected providers (such as AT&T and Frontier) that sell VoIP telephone services and a

United States District Court
Northern District of California

broadband connection between the user's physical address and the provider's network.[1] In contrast, "nomadic" VoIP providers (such as Vonage or Ooma) sell only the VoIP service, which allows users to use the service anywhere there is an internet connection.[2]

Unlike traditional telephone companies, which (by law in the twentieth century) offered separate intrastate (local and toll) and interstate (long-distance) services, VoIP providers offer only any-distance calls, did not design separate intrastate and interstate networks, and cannot determine whether a telephone number reflects a physical location.[3] The first six digits of a ten-digit telephone number historically were tied to a geographic area, but due to "technological, regulatory, and marketplace developments," it has not been reasonable or reliable for many years to assume that a called party is physically located in that geographic area.[4]

### 2. Federal Statutory Scheme

The Communications Act establishes a dual system of federal and state authority. The FCC regulates interstate and foreign commerce in wire and radio communications. 47 U.S.C. § 151. It cannot exercise jurisdiction over intrastate wire and radio communications absent a specific provision of the Act giving it authority. *Id.* § 152(b). The Supreme Court has described § 152(b) as a jurisdictional boundary that preserves state authority over intrastate communications unless Congress has clearly indicated otherwise. *La. Pub. Serv. Comm'n*, 476 U.S. at 370. The Telecommunications Act of 1996 gave the FCC some authority over a portion of intrastate matters previously reserved for the states. *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 377–81 (1999). But absent a specific provision giving the FCC intrastate authority, the jurisdictional limits remain. *Glob. Tel\*Link v. FCC*, 866 F.3d 397, 409 (D.C. Cir. 2017) (§ 152(b) sets a presumption against

---

[1] Compl. – ECF No. 1 at 6 (¶¶ 24–27). The parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c)(1). Consents – ECF Nos. 19–20. Citations refer to the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Compl. – ECF No. 1 at 6–7 (¶ 28) (can offer users the ability to have internet calls from any location).

[3] *Id.* at 7–8 (¶¶ 30–31), 14 (¶¶ 53–54).

[4] *Id.* at 14–15 (¶ 55) (citing *Rates for Interstate Inmate Calling Servs.*, 36 FCC Rcd. 9519, 9629–30 ¶ 246 (2021)).

United States District Court
Northern District of California

the FCC's regulation of intrastate communications; voided FCC order setting intrastate rate caps for inmate-calling services); *see La. Pub. Serv. Comm'n*, 476 U.S. at 373 (§ 152(b) is a jurisdictional limit on the FCC's power and a rule of statutory construction).

Courts have recognized a limited "impossibility exception" to § 152(b)'s preservation of state authority where (1) preemption is necessary to protect a valid federal regulatory objective, and (2) state regulation negates the FCC's exercise of its authority because interstate and intrastate aspects of the communication service are inseverable. *Pub. Serv. Comm'n of Md.*, 909 F.2d at 1515; *California v. FCC*, 905 F.2d at 1243 (FCC order must be narrowly tailored to preempt only state regulations that negate valid regulatory goals).

### 3. FCC Regulation of VoIP

Title II of the Communications Act gives the FCC express authority to regulate all wireline telecommunication services. 47 U.S.C. §§ 201–276; *see, e.g.*, *id.* § 201 (services and charges). It generally lacks jurisdiction over Title I information services, defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." *Id.* § 153(24). The Supreme Court has held that the FCC has discretion to classify services. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–81 (2005) (under now over-ruled *Chevron* deference). It can exercise authority over Title I and unclassified services if it is reasonably ancillary to the effective performance of its specific statutory responsibilities. *United States v. Sw. Cable Co.*, 392 U.S. 157, 178 (1968); *California v. FCC*, 905 F.2d at 1240 n.35.

An "interconnected VoIP service" is a service that (1) enables real-time, two-way voice communications, (2) requires a broadband connection from the user's location, (3) requires "internet protocol-compatible customer premises equipment," and (4) permits users to receive calls from and terminate calls to "the public switched telephone network." 47 U.S.C. § 153(25); 47

United States District Court
Northern District of California

C.F.R. § 9.3. The FCC has regulated interconnected VoIP services without explicitly classifying them under Title I or II.[5]

For example, like Title II carriers, interconnected VoIP providers must contribute to the federal Universal Service fund, established to ensure affordable telecommunications and broadband access, particularly in rural, high-cost, low-income areas. *Universal Serv. Contribution Methodology*, 21 FCC Rcd. 7518, 7542–43 ¶ 48 (the VoIP providers interconnected with Title II carriers; a mandated contribution thus was reasonably ancillary to § 254's requirement that the FCC "preserve and advance universal service"). VoIP providers must route 911 calls to emergency operators and protect the privacy of customer proprietary network information.[6] The FCC has not extended some POTS regulations, such as its rules prohibiting cramming (unauthorized charges on phone bills) to VoIP providers, because there was no evidence of a problem.[7] Most relevantly to this dispute, it has preempted Minnesota's imposition of market-entry and tariff regulations on Vonage's nomadic VoIP service DigitalVoice. *Vonage Holdings Corp.*, 19 FCC Rcd. 22404, 22406 ¶ 5, 22408–09 ¶¶ 10–11 (2004) (all statutes and regulations governing a "telephone company," including obtaining operating authority, filing tariffs, and providing and funding 911 services). There was "no practical way to sever DigitalVoice into interstate and intrastate communications . . . ." *Id.* at 22423 ¶ 31. The "lack of dependence on *any* geographically defined location . . . most distingishe[d] DigitalVoice from other services whose federal or state jurisdiction is determined based on the geographic end points of the communications." *Id.* at 22420 ¶ 25.

In an amicus brief to the Eighth Circuit addressing Minnesota's imposition of market-entry and tariff regulations, the FCC described its orders as establishing "measured and appropriate

---

[5] Compl. – ECF No. 1 at 10 (¶ 39) (has not classified as Title I or II); App. A – ECF No. 29-1 (FCC orders). The parties have not asked the court to declare whether fixed VoIP is a Title II telecommunications service or a Title I information service. Mot. – ECF No. 23 at 28. The issue provides context for the FCC's orders and an FCC amicus brief.

[6] Opp'n – ECF No. 29 at 11; Brief of the FCC as Amicus Curiae in Support of Plaintiffs-Appellees at 14–15, *Charter Adv. Servs. (MN), LLC v. Lange*, 903 F.3d 715 (8th Cir. 2018) (No. 17-2290), https://bit.ly/4nw9uBv (collecting FCC orders) (hereinafter FCC Amicus Br.).

[7] Compl. – ECF No. 1 at 9–10 (¶ 38), 10 nn.13–14 (citing FCC orders); Opp'n – ECF No. 29 at 11 (citing *id.* and characterizing the decision as declining to extend POTS' truth-in-billing rules).

ORDER – No. 25-cv-08959-LB                5

mechanisms for regulating VoIP service."[8] It elaborated that if a state identified "other regulatory needs" related to VoIP services, it should "raise[] those concerns" with the FCC, which "would allow the FCC to offer a solution that would apply nationwide," avoiding "a patchwork of different and potentially conflicting rules" and a state "blunderbuss approach to VoIP regulation" that would "disrupt the national voice services market."[9]

### 4. California's Regulation of VoIP

From 2013 to 2019, with some exceptions, California removed VoIP and internet-enabled services from CPUC's jurisdiction. Cal. Pul. Utils. Code § 710. The law sunset on January 1, 2020. Thereafter, the CPUC took three regulatory steps.

First, it implemented an emergency disaster-relief program for communication-service providers, including fixed VoIP providers, requiring waivers of fees and free services for a specified time after a declared disaster.[10]

Second, it determined that under the FCC's *Vonage* order, state market-entry regulations were expressly preempted for nomadic carriers.[11]

Third, following a rule-making process that involved public comments, briefing, and a hearing, the CPUC issued General Order 133-E, the decision challenged here.[12] AT&T and Frontier had poor maintenance measured against CPUC's requirements for ninety-percent repair of customer outages in twenty-four hours (compliance of 44.5 percent to 59.2 percent over four years), and VoIP outages of more than thirty minutes fared poorly compared to traditional telephone carriers or

---

[8] FCC Amicus Br., *supra* note 6, at 2.

[9] *Id.* at 25–26. In *Charter*, the parties disputed whether VoIP should be classified as a Title I information service or a Title II telecommunications service. 903 F.3d at 719. The court held that VoIP is an information service, focusing on whether VoIP offered a "net protocol conversion," not whether the FCC's orders had preclusive effect. *Id.* at 719–20.

[10] Mot. – ECF No. 23 at 14 (parties — including AT&T and Frontier — challenged the CPUC's exercise of jurisdiction but did not seek judicial review).

[11] *Id.* (summarizing *VoIP Licensing Decision*, D.24-11-003, at 24 (Cal. Pub. Utils. Comm'n Nov. 7, 2024)).

[12] *Id.* at 15–16 (summarizing process).

wireless providers (in 2021, traditional telephone carriers reported 1,185 events, wireless carriers reported 3,315, and VoIP carriers reported 9,000).[13] The CPUC decision extends POTS service-quality standards to fixed (but not nomadic) interconnected VoIP providers with more than 5,000 access lines: (1) completing new-service installation within five business days (with fines of $5 per customer per day for non-compliance); (2) restoring outages within twenty-four hours (with per-line daily fines of $5); and (3) maintaining 24/7 toll-free customer-service lines, with representatives answering eighty percent of calls within sixty seconds (with fines of $5 per line multiplied by ten percent for each day of non-compliance). *Rules Governing Telecomms. Servs.*, CPUC General Order 133-E §§ 2.1(a), (f), 2.2(a), 2.3(a)(i)–(iii), (f) (Sep. 18, 2025). Reporting requirements include submitting a corrective-action plan with the provider's investments to address a failure to correct reporting outages within twenty-four hours. *Id.* at 4.

## ANALYSIS

A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It may fail by lacking a cognizable legal theory or sufficient facts under one. *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016). The court accepts factual allegations as true and construes them favorably to plaintiffs. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018). But allegations must state a plausible claim. *Twombly*, 550 U.S. at 570.

The service-quality rules advance the CPUC's mandate to provide "adequate, efficient, just, and reasonable service, . . . equipment, and facilities, including telephone facilities," needed to "promote the safety, health, comfort, and convenience of . . . the public," a traditional police power. Cal. Pub. Utils. Code § 451. This triggers a presumption against preemption that cannot "be superseded" absent "the clear and manifest purpose of Congress" or the federal agency. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *Nation v. City of Glendale*, 804 F.3d 1292, 1297–98 (9th Cir. 2015).

---

[13] *Id.* at 16 (summarizing record).

United States District Court
Northern District of California

USTelecom alleges conflict preemption of the CPUC service-quality rules under the impossibility exception.[14] It asserts the FCC's "single, national regime for VoIP services," where the CPUC rules conflict with a procompetitive, light-touch policy, and intrastate/interstate segregation is impossible.[15] It sufficiently pleads inseverability.[16] But it does not show that preemption protects an FCC objective or that the rules negate FCC authority. *Pub. Serv. Comm'n of Md.*, 909 F.2d at 1515.

No FCC order preempts these service-quality rules (installation, outages, repair, responsiveness).[17] Unlike *Vonage*'s preemption of market-entry/tariff rules for nomadic VoIP, these differ (by protecting consumers and public safety) and apply to fixed VoIP. *Vonage Holdings Corp.*, 19 FCC Rcd. at 22423 ¶ 3, 22408–09 ¶¶ 10–11 (at stake was all statutes and regulations governing a "telephone company," including obtaining operating authority, filing tariffs, and providing and funding 911 services; did not address performance standards). The FCC's presence in VoIP regulation does not imply conflict. Without a conflict, there is no preemption. *La. Pub. Serv. Comm'n*, 476 U.S. at 374–76. The FCC orders lack a clear intent to displace state rules regarding service quality. *Nation*, 804 F.3d at 1297–98. Instead, they recognize state roles in consumer

---

[14] Opp'n – ECF No. 29 at 15.

[15] Compl. – ECF No. 1 at 15–16 (¶¶ 57–64).

[16] The defendants contend that the court need not accept USTelecom's allegation that intrastate and interstate aspects cannot be unbundled because "at least some fixed VoIP providers can track the jurisdictional endpoints of their calls." Mot. – ECF No. 23 at 21. They point to the FCC's suggestion that some fixed VoIP providers could separate interstate and intrastate traffic. *Id.* at 21–22 (citing *Universal Serv. Contribution Methodology*, 21 FCC Rcd. 7518 (2006)). Courts have reached this conclusion. *Id.* at 22–23 (citing *Centurytel of Chatham, LLC v. Sprint Commc'ns Co., L.P.*, 185 F. Supp. 3d 932, 944 (W.D. La. 2016) ("[S]oon after the 2004 *Vonage* decision, technology evolved to enable companies to track the jurisdictional confines of 'fixed' (or non-portable) VoIP-originated calls.")). But USTelecom alleges that "in most circumstances, fixed VoIP providers cannot determine on a real-time basis whether a particular call is intrastate or interstate" and "have no reliable method for knowing the location of the person at the other end of the call while the call is occurring." Compl. – ECF No. 1 at 14 (¶ 54). This is sufficient. *Interpipe*, 898 F.3d at 886–87 (fact allegations accepted as true).

[17] No binding authority requires an on-point FCC order. *California v. FCC*, 905 F.2d at 1243–45 (discussing only the standard to apply to an FCC order). The impossibility exception may apply absent an FCC decision. Opp'n – ECF No. 29 at 18–19 (collecting cases); *see, e.g.*, *Charter Advanced Servs. (MN), LLC v. Heydinger*, No. 15-cv-3935 (SRN/HB), 2016 WL 11491383 (D. Minn. Apr. 21, 2016), *R. & R. adopted as modified*, No. 15-3935 (SRN/KMM), 2016 WL 3661136 (D. Minn. July 5, 2016). Even assuming that an on-point FCC order is not required, USTelecom still must plead a conflict. The court addresses that issue without deciding whether an FCC order is required.

United States District Court
Northern District of California

protection. *Vonage Holdings Corp.*, 19 FCC Rcd. at 22405 ("[S]tates will continue to play their vital role in protecting consumers . . . for example, . . . generally responding to consumer inquiries and complaints."); *Amendments to Part 4 of the Comm'n's Rules Concerning Disruptions to Commc'ns*, 36 FCC Rcd. 6136, 6152–53 (¶¶ 56–57) (2021) (FCC rejected requests from industry members to preempt state-outage reporting requirements; "states can determine what outage reporting requirements are most appropriate for their jurisdictions").

Given this analysis, dispositive on its own, USTelecom does not rebut the presumption against preemption of California's exercise of its police power. *Nation*, 804 F.3d at 1297–98.

The motion to dismiss is granted.

## CONCLUSION

Any amended complaint is due by March 23, 2026, and must attach a blackline compare of the new complaint against the current complaint.

This resolves ECF No. 23.

**IT IS SO ORDERED.**

Dated: February 24, 2026

LAUREL BEELER
United States Magistrate Judge

United States District Court
Northern District of California

ORDER – No. 25-cv-08959-LB                    9